# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

| | | |
|---|---|---|
| CYNTHIA HOPKINS and GEOFFREY HOPKINS, *individually and on behalf of the* ESTATE OF MARK HOPKINS, *Deceased*; and<br><br>ALYSSA MICHELLE WILSON;<br>*Plaintiffs,*<br><br>v.<br><br>CITY OF COLLEGE STATION, TEXAS;<br><br>CHIEF OF POLICE BILLY COUCH;<br><br>OFFICER DAKOTA NORRIS;<br><br>OFFICER, INVESTIGATOR CHRISTIAN TAYLOR LOVELACE;<br><br>OFFICER, INVESTIGATOR JONATHAN D. HUTH;<br><br>OFFICER, SGT. RICHARD BENTON KEOUGH;<br><br>OFFICER PATRICK S. MCCLUNG;<br><br>OFFICER, OPERATION COMMANDER STEVE BROCK;<br><br>OFFICER LONG V. LE;<br><br>OFFICER KELBY PEREZ;<br><br>OFFICER PATRICK J. MCCARTHY;<br><br>OFFICER, BUREAU COMMANDER, and ASSISTANT CHIEF MICHAEL H. PAVELKA;<br>*Defendants.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **PLAINTIFFS' ORIGINAL COMPLAINT**<br>**JURY TRIAL DEMANDED**<br><br><br>**CIVIL ACTION NO. 4:25-cv-00473**<br><br>*For the following causes of action:*<br><br>COUNT 1:   42 U.S.C. § 1983 –<br>Unreasonable Search and Seizure<br><br>COUNT 2:   42 U.S.C. § 1983 –<br>Excessive, Deadly Force<br><br>COUNT 3:   42 U.S.C. § 1983 –<br>Excessive Force<br><br>COUNT 4:   42 U.S.C. § 1983 –<br>Supervisor or Bystander Liability<br><br>COUNT 5:   42 U.S.C. § 1983 –<br>Invasion of Privacy<br><br>COUNT 6:   42 U.S.C. § 1983 –<br>Failure to Train, Supervise, or Discipline & Ratification |

## PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiffs Cynthia Hopkins and Geoffrey Hopkins, individually as the biological parents of Mark Hopkins, and on behalf of the Estate of Mark Hopkins, deceased and Alyssa Michelle Wilson ("Plaintiffs") file this Original Complaint and Jury Demand regarding the conduct of Defendants the CITY OF COLLEGE STATION, TEXAS (more particularly the College Station Police Department ("CSPD")); CHIEF OF POLICE BILLY COUCH; OFFICER DAKOTA NORRIS; OFFICER, INVESTIGATOR CHRISTIAN TAYLOR LOVELACE; OFFICER, INVESTIGATOR JONATHAN D. HUTH; OFFICER, SGT. RICHARD BENTON KEOUGH; OFFICER PATRICK S. MCCLUNG; OFFICER, OPERATION COMMANDER STEVE BROCK; OFFICER LONG V. LE; OFFICER KELBY PEREZ; OFFICER PATRICK J. MCCARTHY; and OFFICER, BUREAU COMMANDER, and ASSISTANT CHIEF MICHAEL H. PAVELKA (collectively referred to as "Defendants"), in their individual capacities and for Plaintiffs' *Monell Claims*; and would show the Honorable Court as follows:

*"If we would have known it was the cops, BUT WE DIDN'T… [Mark] thought he was protecting me from a crazy person, like, someone breaking in the house. He was like, "Hide! CALL 911! Hide!"[1]*

## I.    NATURE OF THE ACTION

1.    **The Horrific and Tragic Scene.** In the early morning hours of February 8, 2023, residents Mark Hopkins, Alyssa Wilson, and Lauren Decoux were violently awakened by the explosion of their front door, coupled with the deafening detonation of a flash-bang grenade. The

---

[1] CSPD Interview of Alyssa Michelle Wilson.

blast shattered the night's silence, followed immediately by the sound of the intruders' heavy boots crashing quickly through the house toward the bedrooms. Mark, believing they were under attack by burglars, grabbed his shotgun and shouted, *"Hide! CALL 911! Hide!"*, as he and his girlfriend, Alyssa, ran to the bedroom's closet. Without warning, the bedroom door is kicked in, followed almost instantly by a hail of gunfire – killing Mark Hopkins.

2.      **No Adequate Announcement.** In the seconds before the hail of gunfire, not one single resident heard, "Police!"; not one single resident saw blue and red lights; and not one single resident believed or had any reason to believe that their home intruders were the police. Alyssa believed they were being robbed or worse, Lauren believed she was about to get "gangbanged," and Mark believed he needed to protect them all. It was only after the hail of gunfire, after the blinding flashlights were removed from Alyssa's face, and as she was being cuffed that she realized her intruders' identity; and, it was only after the hail of gunfire, after the breaking and entering of Lauren's bedroom, and after she was able to see their faces that Lauren realized her intruders' identity. Tragically, Mark was never given the opportunity to realize that the intruders were members of the College Station Police Department.

3.      **Patently Incompetent, Grossly Excessive, and Unreasonably Unnecessary Military-Style Raid.** This violent military-style raid was part of a botched search for Abraham Escobar, a small-time seller of marijuana to college students. Escobar did not live at the residence, his vehicle was not parked at the residence, and he was some 2200 miles away in Oregon at the time of the assault. Despite these numerous glaring red flags, the College Station Police Department ("CSPD") launched a military-style, predawn assault, deploying a flash-bang, and armed officers in tactical gear, despite the peaceful, off-campus setting. In all, three such raids

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

were conducted in succession that morning in a patently incompetent process-of-elimination search for a low-level, college-student-pot-dealing target.

4.    **Plaintiffs' Action and Prayer.** Mark Hopkins died defending himself, his girlfriend, his roommate, and his home – a right to defend enshrined in Texas's Castle Doctrine. Mark's parents now bring this action against Defendants alleging the violation of Mark's civil rights pursuant to 42 U.S.C. § 1983 and Alyssa Michelle Wilson brings this action against Defendants alleging the violation of her civil rights pursuant to 42 U.S.C. § 1983, including, *inter alia*: unreasonable search and seizure; invasion of privacy; excessive force; wrongful death; and the failures of CSPD officers in their individual capacities and failures of the City of College Station and its CSPD. The College Station City Council, the City of College Station's final policymaker for the CSPD, vested with all powers of the City and the determination of all matters of policy and Chief of Police, Billy Couch, with the authority for setting policies, including training of the CSPD Officers, made this possible and probable. The City of College Station, through the CSPD, had a duty, but failed to implement and enforce such policies, practices, and procedures for the CSPD that respected their constitutional rights to protection and equal treatment under the law. The College Station City Council and Chief Couch's failure to implement the necessary policies and the (de facto) implementation of unconstitutional policies, caused Mark to experience an unwarranted and excruciating physical assault and mental anguish before his ultimate death. For these civil rights violations and other causes of action discussed herein, Plaintiffs seek accountability and compensation for their respective damages.

## II.    PARTIES

5.    Plaintiff re-alleges all of the allegations in the previous paragraphs, as though fully set forth herein.

6.      **Plaintiff Cynthia Hopkins** is a citizen of the United States and a resident of Comal County, Texas. Ms. Hopkins is acting as a personal representative of the Estate of Mark Hopkins and also brings this lawsuit in her individual capacity as the biological mother of Mark Hopkins.

7.      **Plaintiff Geoffrey Hopkins** is a citizen of the United States and a resident of Comal County, Texas. Mr. Hopkins is also acting as a personal representative of the Estate of Mark Hopkins and also brings this lawsuit in his individual capacity as the biological father of Mark Hopkins.

8.      **Plaintiff Alyssa Michelle Wilson** is a citizen of the United States and a resident of Montgomery County, Texas and brings this lawsuit in her individual capacity.

9.      **Defendant CITY OF COLLEGE STATION** is a municipality located in Brazos County, Texas. *The City of College Station may be served with citation herein by and through its agent for service of process, Adam C. Falco, City Attorney, City Attorney's Office, 1101 Texas Ave., College Station, Texas 77840.*

10.      **Defendant CHIEF OF POLICE BILLY COUCH**, upon information and belief, is a resident of Brazos County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for The City of College Station and CSPD.  Defendant Couch is being sued in this lawsuit in his individual capacity and as policymaker for The City of College Station and CSPD on issues of law enforcement.  *Defendant Couch may be served with citation at the College Station Police Department, 800 Krenek Tap Road, College Station, Texas 77840 or wherever he may be found.*

11.      **Defendant OFFICER DAKOTA NORRIS**, upon information and belief, is a resident of Brazos County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for The City of College Station and CSPD.

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

Defendant Norris is being sued in this lawsuit in his individual capacity.  ***Defendant Norris may be served with citation at the College Station Police Department, 800 Krenek Tap Road, College Station, Texas 77840 or wherever he may be found.***

12.    Defendant **OFFICER, INVESTIGATOR CHRISTIAN TAYLOR LOVELACE**, upon information and belief, is a resident of Brazos County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for The City of College Station and CSPD.  Defendant Lovelace is being sued in this lawsuit in his individual capacity.  ***Defendant Lovelace may be served with citation at the College Station Police Department, 800 Krenek Tap Road, College Station, Texas 77840 or wherever he may be found.***

13.    Defendant **OFFICER, INVESTIGATOR JONATHAN D. HUTH**, upon information and belief, is a resident of Brazos County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for The City of College Station and CSPD.  Defendant Huth is being sued in this lawsuit in his individual capacity.  ***Defendant Huth may be served with citation at the College Station Police Department, 800 Krenek Tap Road, College Station, Texas 77840 or wherever he may be found.***

14.    Defendant **OFFICER, SGT. RICHARD BENTON KEOUGH**, upon information and belief, is a resident of Brazos County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for The City of College Station and CSPD.  Defendant Keough is being sued in this lawsuit in his individual capacity.  ***Defendant Keough may be served with citation at the College Station Police Department, 800 Krenek Tap Road, College Station, Texas 77840 or wherever he may be found.***

15.    Defendant **OFFICER PATRICK S. MCCLUNG**, upon information and belief,

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

is a resident of Brazos County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for The City of College Station and CSPD. Defendant McClung is being sued in this lawsuit in his individual capacity. ***Defendant McClung may be served with citation at the College Station Police Department, 800 Krenek Tap Road, College Station, Texas 77840 or wherever he may be found.***

16. **Defendant OFFICER, OPERATION COMMANDER STEVE BROCK**, upon information and belief, is a resident of Brazos County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for The City of College Station and CSPD. Defendant Brock is being sued in this lawsuit in his individual capacity. ***Defendant Brock may be served with citation at the College Station Police Department, 800 Krenek Tap Road, College Station, Texas 77840 or wherever he may be found.***

17. **Defendant OFFICER LONG V. LE**, upon information and belief, is a resident of Brazos County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for The City of College Station and CSPD. Defendant Le is being sued in this lawsuit in his individual capacity. ***Defendant Le may be served with citation at the College Station Police Department, 800 Krenek Tap Road, College Station, Texas 77840 or wherever he may be found.***

18. **Defendant OFFICER KELBY PEREZ**, upon information and belief, is a resident of Brazos County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for The City of College Station and CSPD. Defendant Perez is being sued in this lawsuit in his individual capacity. ***Defendant Perez may be served with citation at the College Station Police Department, 800 Krenek Tap Road, College Station, Texas 77840 or wherever he may be found.***

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

19.     **Defendant OFFICER PATRICK J. MCCARTHY**, upon information and belief, is a resident of Brazos County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for The City of College Station and CSPD.  Defendant McCarthy is being sued in this lawsuit in his individual capacity.  ***Defendant McCarthy may be served with citation at the College Station Police Department, 800 Krenek Tap Road, College Station, Texas 77840 or wherever he may be found.***

20.     **Defendant OFFICER, BUREAU COMMANDER, and ASSISTANT CHIEF MICHAEL H. PAVELKA**, upon information and belief, is a resident of Brazos County, Texas, and, at all times material herein, was a police officer allegedly acting in the course and scope of his employment for The City of College Station and CSPD.  Defendant Pavelka is being sued in this lawsuit in his individual capacity.  ***Defendant Pavelka may be served with citation at the College Station Police Department, 800 Krenek Tap Road, College Station, Texas 77840 or wherever he may be found.***

## III.     <u>JURISDICTION AND VENUE</u>

21.     Plaintiff re-alleges all of the allegations in the previous paragraphs, as though fully set forth herein.

22.     Jurisdiction exists in this court pursuant to 28 U.S.C. §§ 1331 and 1343 as this action is brought under, *inter alia*, the Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983, to redress the deprivation of rights, privileges, and immunities.

23.     This Court has general personal jurisdiction over Defendants because they reside and/or work in College Station, Brazos County, Texas, and over the City of College Station because it is a Texas municipality located within this Division and District.

24.     This Court has specific *in personam* jurisdiction over Defendants because this case arises out of conduct that caused the death of Mark Hopkins, which occurred in City of College Station, Brazos County, Texas, within the Southern District of Texas.

25.     Venue is proper in this court because the causes of action occurred within the Southern District of Texas, Houston Division.

### IV.     PROCEDURAL HISTORY TO DATE

26.     Plaintiff re-alleges all of the allegations in the previous paragraphs, as though fully set forth herein.

27.     Prior to this instant action, on October 9, 2023, the Hopkins filed a "Petition Pursuant To Tex., R. Civ. Pro. 202 For Depositions To Investigate Claims" in **Cause No. 23-002880-CV-85**; *Cynthia Hopkins, et al. v. City of College Station*; In the 85th Judicial District Court of Brazos County, Texas (hereinafter "TRCP 202 Pre-suit Deposition").

28.     The product of that TRCP 202 Pre-suit Deposition resulted in the production of documents, but no depositions have taken place to date. Nevertheless, the limited discovery and document production produced under the TRCP 202 Pre-suit Deposition supports Plaintiffs' factual allegations stated herein and below. Specifically, a video was produced titled, "CONFIDENTIAL_Norris_BWC_CS0010.mp4."

29.     TRCP 202 Pre-suit Deposition proceedings are not separate lawsuits; they are considered ancillary proceedings. As such, upon filing this complaint, said TRCP 202 Pre-suit Deposition is hereby moot.  *See, e.g., Baylor Coll. of Med. v. Yeo*, No. 01-22-00210-CV, 2022 WL 3363943, at *1 (Tex. App.—Houston [1st Dist.] Aug. 16, 2022, no pet.).

## V.    EXHIBIT ATTACHED

30.    Plaintiff re-alleges all of the allegations in the previous paragraphs, as though fully set forth herein.

31.    Attached and incorporated by reference, as though set forth fully herein, is a 03:12 video of Defendant Norris's body camera, which shows the raid and shooting death of Mark Hopkins, which video is attached as:

- **Exhibit A:        CONFIDENTIAL_Norris_BWC_CS0010**

The video of the incident has been attached as an exhibit, but due to the inability of counsel to attach that video electronically, a copy has been delivered to the Federal District Clerk to be attached to this case, as Exhibit A to Plaintiffs' Original Complaint And Jury Demand.

## VI.    FACTS RELEVANT TO ALL COUNTS

32.    Plaintiff re-alleges all of the allegations in the previous paragraphs, as though fully set forth herein.

33.    **Plaintiffs – the Hopkins & Alyssa.** Cynthia Hopkins and Geoffrey Hopkins are the loving and grieving parents of their late son, Mark Hopkins, and bring this lawsuit seeking justice and accountability against Defendants for their unconstitutional violations resulting in the wrongful death of Mark Hopkins; and, Plaintiff Alyssa Michelle Wilson ("Alyssa") brings this lawsuit seeking justice and accountability against Defendants for their unconstitutional violations resulting in her own injuries and damages.

34.    **Defendant CITY OF COLLEGE STATION, TEXAS and more particularly the College Station Police Department ("CSPD") (hereinafter, any reference to CSPD refences and implicates Defendant CITY OF COLLEGE STATION, TEXAS).** The City of College Station funds and operates the CSPD, which, along with the College Station City Council,

College Station City Manager's office and Chief of Police Billy Couch, are responsible for the implementation of the CSPD's budget, policies, procedures, practices, customs, and usages, as well as the acts and omissions, challenged by this suit. The CSPD is also responsible for preventive, investigative, and enforcement services for all citizens of the City of College Station. All actions that form the basis of this lawsuit were performed pursuant to policies and procedures, customs, practices, and usages of Defendant, the City of College Station. The City of College Station's responsibility and duty is to promulgate, implement, train, and enforce policies and procedures prohibiting unlawful searches, seizures, detentions, arrests, invasions of privacy, and exercises of excessive and deadly force, in violation of minimum constitutional and statutory requirements; to properly hire, fire, discipline, train, and supervise police officers and to not hire or retain police officers with a known propensity for police misconduct. Defendant City of College Station and CSPD failed in those regards, violated Plaintiffs' constitutional rights, and Plaintiffs bring their claims and causes of action, including *Monell* claims against said defendant.

35.    **Defendant CHIEF OF POLICE BILLY COUCH** is the Chief Executive Officer and Chief of Police for the College Station Police Department; he is the policymaker in charge of drafting, implementing, and enforcing all policies, procedures, practices, customs, and usages of CSPD; he is ultimately responsible for the hiring, firing, disciplining, training, and supervision of CSPD's police officers; and he is to ensure that he and his officers maintain their duty and responsibility to treat all persons in compliance with constitutional and statutory requirements and in compliance with the CSPD's rules, regulations, policies and procedures, customs and/or practices relating to, *inter alia,* searches, seizures, detentions, arrests, invasions of privacy, and exercises of excessive and deadly force – that is, "to not act incompetently and unconstitutionally." Defendant Couch failed in his duties, violated Plaintiffs' constitutional rights, and ratified, as the

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

City of College Station's policymaker on law enforcement concerns, the "Defendant Raid Officers" conduct herein.

36.    **"Defendant Raid Officers."** Those CSPD officers whose action and omissions were incompetent and unconstitutional with respect to the raid on 925 Spring Loop include the following: Defendants CHIEF OF POLICE BILLY COUCH; OFFICER DAKOTA NORRIS; OFFICER, INVESTIGATOR CHRISTIAN TAYLOR LOVELACE; OFFICER, INVESTIGATOR JONATHAN D. HUTH; OFFICER, SGT. RICHARD BENTON KEOUGH; OFFICER PATRICK S. MCCLUNG; OFFICER, OPERATION COMMANDER STEVE BROCK; OFFICER LONG V. LE; OFFICER KELBY PEREZ; OFFICER PATRICK J. MCCARTHY; and OFFICER, BUREAU COMMANDER, and ASSISTANT CHIEF MICHAEL H. PAVELKA (collectively referred to as "Defendant Raid Officers"). At all times relevant to this lawsuit, said Defendant Raid Officers were acting within the course and scope of their employment as police officers and were acting under color of state law for CSPD. Said Defendant Raid Officers, each of them, had a duty and responsibility to not act incompetently and unconstitutionally. Said Defendant Raid Officers had a duty to constitutionally train, supervise, and intervene. Said Defendant Raid Officers had a duty to not ratify unconstitutional conduct. Said Defendant Raid Officers, each of them, failed in those regards and violated Plaintiffs' constitutional rights, as more specifically complained of herein and below.

37.    **Defendant OFFICER DAKOTA NORRIS**. Defendant Norris was the point lead on the raid of 925 South Loop, conducted the incompetent "knock and announce" complained of herein, permitted the use of a mechanical breach complained of herein, permitted the use of a flash-bang device complained of herein, failed to train, supervise, and intervene in the patently

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

incompetent, grossly excessive, and unreasonably unnecessary military-style raid, and shot and killed Mark Hopkins.

38.     **Defendant OFFICER, INVESTIGATOR CHRISTIAN TAYLOR LOVELACE**. Defendant Lovelace conducted the 3 ½ year investigation of Abraham Escobar, and he set the stage for and failed to intervene in the patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid. What's more, Defendant Lovelace arrived at 925 South Loop prior to SWAT's arrival and had 13 minutes to assess the absence of Abraham Escobar's vehicle and the absence of any activity inside 925 South Loop suggesting the presence of Abraham or any threat therein before the patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid and shooting death of Mark Hopkins.

39.     **Defendant OFFICER, INVESTIGATOR JONATHAN D. HUTH**. Defendant Huth prepared the patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid's Operation Plan; briefed the Defendant Raid Officers on the Operation Plan; and permitted the incompetent "knock and announce" complained of herein, permitted the use of a mechanical breach complained of herein, permitted the use of a flash-bang device complained of herein, and failed to train, supervise, and intervene in the patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid.

40.     **Defendant OFFICER, SGT. RICHARD BENTON KEOUGH**. Defendant Keough was the supervisor of the Special Investigation Unit ("SIU"); assisted Defendant Lovelace in the 3 ½ year investigation of Abraham; was assistant team leader of the SWAT team that raided 925 Spring Loop; was responsible for the insufficient count, the command for if and when to force entry into the location, and then entry into the location to assist in securing it; was cover for Defendant Le in the stack, the number 4 position that would be entering the structure; supervisor

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

of the entry; and permitted the incompetent "knock and announce" complained of herein, permitted the use of a mechanical breach complained of herein, permitted the use of a flash-bang device complained of herein, and failed to train, supervise, and intervene in the patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid.

41.    **Defendant OFFICER PATRICK S. MCCLUNG**. Defendant McClung was in charge of making announcements and turning on the blue and red lights to warn the residents of 925 Spring Loop that a search warrant was being conducted by police; he arrived to the raid late; by the time he stopped, turned on his lights, and made an announcement, the Defendant Raid Officers had already breached the door, were inside, and were in the process of shooting Mark Hopkins; and contributed to the in the patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid, incompetent "knock and announce" complained of herein, and failed to train, supervise, and intervene as complained of herein.

42.    **Defendant OFFICER, OPERATION COMMANDER STEVE BROCK**. Defendant Brock signed off on the false, exaggerated, and unreasonable Threat Matrix on 925 Spring Loop; permitted the incompetent "knock and announce" complained of herein, permitted the use of a mechanical breach complained of herein, permitted the use of a flash-bang device complained of herein, and failed to train, supervise, and intervene in the patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid. What's more, Defendant Brock, as a supervisor, ratified Defendant Norris's actions and the actions of Defendant Raid Officers after the fact.

43.    **Defendant OFFICER LONG V. LE**. Defendant Le was the Defendant Raid Officer that set off and threw the flash-bang inside 925 Spring Loop – without looking to see who, if anyone was nearby who could be injured and whether anything flammable was nearby that could

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

start a fire; was part of and permitted the incompetent "knock and announce" complained of herein, permitted the use of a mechanical breach complained of herein, permitted and executed the use of a flash-bang device complained of herein; and failed to train, supervise, and intervene in the patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid.

44.     **Defendant OFFICER KELBY PEREZ**. Defendant Perez was the Defendant Raid Officer that conducted the mechanical breach; was part of and permitted the incompetent "knock and announce" complained of herein, permitted and executed the use of a mechanical breach complained of herein, permitted the use of a flash-bang device complained of herein; and failed to train, supervise, and intervene in the patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid.

45.     **Defendant OFFICER PATRICK J. MCCARTHY**. Defendant McCarthy was the immediate supervisor of Defendant Norris; permitted the incompetent "knock and announce" complained of herein, permitted the use of a mechanical breach complained of herein, permitted the use of a flash-bang device complained of herein, and failed to train, supervise, and intervene in the patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid. What's more, Defendant McCarthy, as a supervisor, ratified Defendant Norris's actions and the actions of Defendant Raid Officers after the fact.

46.     **Defendant OFFICER, BUREAU COMMANDER, and ASSISTANT CHIEF MICHAEL H. PAVELKA**. Defendant Pavelka was head of the SIU and SWAT; was a supervisor of Defendant Norris; permitted the incompetent "knock and announce" complained of herein, permitted the use of a mechanical breach complained of herein, permitted the use of a flash-bang device complained of herein; and failed to train, supervise, and intervene in the patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid. What's more,

Page 15 of 60

Defendant Pavelka, as a supervisor, ratified Defendant Norris's actions and the actions of Defendant Raid Officers after the fact.

47.     **Mark Hopkins ("Mark").** Prior to and on February 8, 2023, Mark was a 22-year-old student at Blinn Junior College, preparing to transfer to Texas A&M. Mark was in a committed relationship with his girlfriend Alyssa Michelle Wilson, who was a houseguest on February 8, 2023.  Prior to the raid, CSPD learned that Mark had no Computerized Criminal History (CCH) or gang-related affiliation whatsoever, and there was no evidence linking or probable cause to suggest that Mark was linked to any illegal drug activities. That is, there was zero evidence or probably cause to suggest that Mark was dangerous, posed a security threat to officers or others, had any prior history of violence, and that any exigent circumstances existed to warrant a military-style raid of his apartment. Furthermore, there is zero evidence indicating whether, prior to February 8, 2023, CSPD ever looked into whether Mark was a gun owner.

48.     **Alyssa Michelle Wilson ("Alyssa").** Prior to and on February 8, 2023, Alyssa was a 24-year-old, recent college graduate of Texas A&M, was in a committed relationship with Mark Hopkins, and was a houseguest of Mark's. Prior to the raid, CSPD learned that Alyssa had no Computerized Criminal History (CCH) or gang-related affiliation whatsoever, and there was no evidence linking or probable cause to suggest that Alyssa was linked to any illegal drug activities. That is, there was zero evidence or probably cause to suggest that Alyssa was dangerous, posed a security threat to officers or others, had any prior history of violence, and that any exigent circumstances existed to warrant a military-style raid of the apartment.

49.     **Lauren Nicole Decoux ("Lauren").** Prior to and on February 8, 2023, Lauren was in a dating relationship with Abraham Eli Escobar and was a roommate of Mark Hopkins. Prior to the raid, CSPD learned that Lauren had no Computerized Criminal History (CCH) or gang-related

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

affiliation whatsoever. The sum total of evidence linking Lauren to any alleged illegal drug activity was her dating relationship with Abraham and a handful of small Venmo payments for rent. Regardless, there was zero evidence or probably cause to suggest that Lauren was dangerous, posed a security threat to officers or others, had any prior history of violence, and that any exigent circumstances existed to warrant a military-style raid of the apartment.

50.     **Abraham Eli Escobar ("Abraham").** Prior to February 8, 2023, CSPD had been investigating Abraham since August of 2019. In the 3 ½ years spent investigating Abraham before the incompetent raid, CSPD allegedly learned that Abraham allegedly sold marijuana (a drug that is legal in 39 of 50 states for medical use and legal in 24 states for recreational use) by the ounce, then allegedly sold same by the pound, and allegedly sold Adderall (a prescription drug to treat ADHD and a known, off-label study aid) to college students; drove a red Chevrolet Pickup Truck; was in a dating relationship with Lauren; and lived at 1811 George Bush Drive E., College Station, Texas. Through multiple investigative tools and surveillance leading up to the incompetent raid, CSPD knew Abraham did not live at 925 Spring Loop and that his vehicle was not present within day(s) of the incompetent raid on February 8, 2023. Prior to the raid, CSPD learned that Abraham had one Computerized Criminal History (CCH) hit for Driving While Intoxicated and no gang-related affiliation. Regardless, Abraham was not physically at 925 Spring Loop, his truck was not at 925 Spring Loop, and there is no evidence to suggest that Abraham was dangerous, posed a security threat to officers or others, had any prior history of violence, and that any exigent circumstances existed to warrant a military-style raid of his girlfriend's apartment when he was some 2200 miles away in Oregon at the time of the incompetent raid.

51.     **The Apartment.** 925 Spring Loop, College Station, Texas is a 1036 sq. ft., 2 bedroom / 2 bath, single-family home that was rented by Mark and Lauren. It is 1.5 miles from

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

Texas A&M, situated in a neighborhood of similar multi-family homes and townhouses. It is a popular choice for students and university staff given its proximity to Texas A&M, has a lower crime rate and property crime rate than Texas and national averages, and being in the northeast part of town, it is generally considered the safest part of College Station. The Apartment appears and is laid out as follows:



In this tiny, 1036 sq. ft. apartment, Mark's bedroom ("BR #1) was adjacent to living room area and closest to the front door. 925 Spring Loop – its neighborhood, its closeness to other family homes, its low crime rate area, its tiny size, and the residents being early-20s-something college students make it unreasonable under the totality of the circumstances for a military-style raid.

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

52.    **4 Planned Raids – *Overview*.** On February 8, 2023, 3 raids were to be conducted on the following addresses in the following order: (i) 1775 Greens Prairie Rd. W., a 2789 sq. ft. 5/3 home, and situated on 20 acres – the alleged stash house for Abraham's illegal drugs; (ii) 3934 Tranquil Path Dr., a 1538 sq. ft. 3/2 home – the alleged residence of Abraham; (iii) 925 Spring Loop Dr., a 1036 sq. ft. 2/2 home – the residence of Abraham's girlfriend, Lauren; and (iv) 1711 N. Earl Rudder Freeway #930, Bryan, Texas – a storage unit. The raid on 1775 Greens Prairie Rd., the alleged stash house, was executed in the hopes of finding illegal drugs and drug paraphernalia; the raid on 3934 Tranquil Path Dr., the alleged residence of Abraham, was executed in the hopes of finding Abraham; and, the raid on 925 Spring Loop was executed in the hopes of finding electronic devices that could be examined to uncover the alleged illegal drug enterprise. Ultimately, at or around 5:00 am, that raid on 1775 Greens Prairie Rd. was productive in uncovering marijuana alleged to be owned by Abraham. That is, prior to the raid on 925 Spring Loop an hour later, CSPD had in their possession illegal drugs, and the threat of complete destruction of any illegal drugs was gone. While there were 4 planned raids, upon information and belief, 3 raids were conducted – excluding the storage unit.

53.    **Threat Assessment for Warrant Service – *CSPD's Policy*.** The policy regarding threat assessments for CSPD is as follows:

> The completed Threat Assessment SHALL be routed to the Division Commander, or his designee, for review prior to the service of the warrant. If the case agent, Supervisor, or Division Commander determines SWAT should be utilized, or in the case of a mandatory SWAT activation, the Threat Assessment and an Operations Plan shall be forwarded to the SWAT Commander, or his designee. This should occur no less than 12 hours prior to the expected warrant service, unless exigent circumstances exist. The case agent shall also brief the SWAT Commander or his designee regarding, the details of the investigation.

The Threat Assessment allows officers to allocate points ("Yes" = 1 point, "No" = 0 points, and "Unknown" = 0.25 points) for various threat issues including Suspect Assessment, Offense Assessment, Weapon Assessment – which also requires the responding officer to write out "How intelligence was obtained:", Site Assessment, and Historical Information. Finally, based on the point totals, a threat assessment score is given, which total concludes:

> 1-4 POINTS = IF REQUESTED, SWAT *MAY* BE USED AT THE DISCRETION OF THE OPERATIONAL COMMANDER; 5-9 POINTS = SWAT COMMANDER SHALL BE CONSULTED. SWAT SHOULD BE USED AS THE PRIMARY CONTACT OR IN SUPPORT OF ALTERNATIVE PLANNING ENTRY, RAPID REACT, OR SUPPORT; 10+ POINTS = SWAT ACTIVATION REQUIRED."

54.     **Threat Assessment for the 4 Raids.** All four raids, determined by Defendant Lovelace, carried the same 2-point base assessment of 1 point for "suspect is a drug or alcohol abuser" and 1 point for "offense is a felony." Where the four differ is in the Weapon Assessment and Site Assessment. The Threat Assessment further identified the following:

- The 1775 Greens Prairie Rd. raid had a Threat Matrix of **7.25**;

- The 3934 Tranquil Path Dr. had a Threat Matrix of **6**;

- The 925 Spring Loop had a Threat Matrix of **5** with the 2-point base and adding 2 points for "scoped rifle/hunting rifle/semi-auto/shotgun (if Escobar is present)" and 1 point for "pistol (if Escobar is present)"; and

- The 1775 Greens Prairie Rd. had a Threat Matrix of **3.25.**

55.     **Threat Assessment for 925 Spring Loop – *Specifically.*** CSPDs policies were violated in this assessment, as follows:

- First, a total of 3 points are falsely allocated for the Weapon Assessment to bring the threat level of this tiny college apartment from a 2 to a 5 and to falsely and unreasonably justify the use of SWAT's patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid;

- Second, the false and unreasonable point allocation and escalation from a 2 to a 5 was only applicable "if Escobar is present," which he was not;

- Third, given the conditional, "if Escobar is present," the presence of a "scoped rifle/hunting rifle/semi-auto/shotgun" and "pistol" should have been given the point allocations of 0.25 for "unknown" – which, had the policy been followed the threat assessment would have been a 2.5 at highest;

- Fourth, Defendant Lovelace was inconsistent with his point allocation for Abraham's Weapon Assessment, giving Abraham's storage unit a 1.25, his stash house a 2, his residence a 3, and his girlfriend's apartment a 3. However, the 3-point allocation for his residence was not conditional on "if Escobar is present" – 925 Spring Loop was;

- Fifth, the Site Assessment is zero (0). There are no geographic barriers or considerations, no upstairs or terrain features, no multiple habitable structures, no site fortification, no lookouts, and no security cameras. That is, the Apartment was not a threat;

- Sixth, it states CSPD will be obtaining a knock and announce search warrant for 925 Spring Loop, "the primary residence of Lauren Decoux" and "through means of investigation Mark Hopkins and Alyssa Wilson" may be additional residents, which confirms that the target was Lauren and computers – not drugs and the possibility of other college student residents; and

- Seventh, against policy, the Threat Assessment concludes that "Tactical Commander [was] Consulted" and specifically that **"SWAT [was] *Not* [to be] Activated."** That is, despite the Supervisor, Division Commander, and the Tactical Commander stating otherwise, Defendant Lovelace proceeded with SWAT's patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid on a Threat Assessment Score of 2 (or at most 2.5) in violation of orders and policy.

56.    **The 925 Spring Loop Search Warrant.** Defendant Investigator Christian Taylor Lovelace drafted the Affidavit and Search Warrant for 925 Spring Loop. Therein, he makes the following unreasonable and unconstitutional errors:

- Defendant Lovelace falsely stated under oath and identified Mark and Alyssa as "Suspected Part[ies]" – neither Mark nor Alyssa participated in any illegal activities of any kind;

- Defendant Lovelace falsely stated under oath that, "Said Suspected Party #1 [(Abraham)] sending Said Suspected Party #2 [(Mark)] money." That is, Defendant Lovelace falsely claimed under oath that Abraham had transferred money to Mark Hopkins via Venmo, a popular money transfer computer app, and Defendant Lovelace made these false statements under penalty of perjury to Judge Ed Spillane of the College Station Municipal Court to secure his search warrant;

- Defendant Lovelace's primary objective in the search of 925 Spring Loop was his "Request to Search for Digital Evidence," as stated in his Affidavit as a section header and as stated in the Search Warrant and capable of being discovered under items 2, 3, 4 ("computers"), 6, 7, 8, and 10 (forensic analysis of "computer") of his 10 numbered requests. Ultimately, the return of the search resulted in the following: "HP laptop, Apple iPhone, 'drug paraphernalia', 'marijuana', Apple iPhone, blk laptop, and silver MacBook"; and

- Defendant Lovelace stated nowhere in the Affidavit and Search Warrant that CSPD would be using SWAT officers armed with AR-15s (5.56 NATO caliber Colt model SMG assault rifles with a silencer, scope, light, and laser attachments, and a 5.56 NATO caliber magazine carrying NATO rounds) and using a flash-bang grenade (DD) in the execution of a search warrant on a 1036 sq. ft. apartment occupied by college students in a peaceful college neighborhood at 6:00 in the morning.

57.     **Operations Plan.** The Operations Plan was prepared by Defendant Jonathan Huth who briefed the CSPD responding officers on February 7, 2023 at 5:00 pm with a target time for execution of 5:00 am on February 8, 2023. That is, by the time of the incompetent raid at approximately 6:00 am, CSPD had 13 hours from the briefing to discover whether Abraham was present at 925 Spring Loop and failed to do so. Abraham's presence would be the only basis for the "possibility" of a firearm inside the home, as briefed by CSPD. CSPD further briefed, "It is unknown if there are other occupants at this location." That is, CSPD incompetently did not assess whether other civilians – namely, college students – would be in the crossfire, when a simple call to the property owner, drive by of the premises in an unmarked vehicle, or a stakeout would have easily revealed same.

58.     **Operations Plan – *cont.*** As for the first raid, the "Special Notes" states that an "AR-15 believed to be in each location" and "No knock"; the second raid states, "AR-15 believed to be in each location" and "Knock and Announce"; and the 925 Spring Loop raid's "Special Notes" states only, "Knock and Announce." That is, there is *no* mention of, "AR-15 believed to be in each location." Nevertheless, SWAT officer defendants planned to use their own AR-15s.

59.     **Operations Plan – *the "planned" execution*.** The plan further states:

> The Team will disembark their vehicles and begin moving down the A side of the structure and stack on the front door. The point pair will begin knocking and demanding entry. After a *reasonable amount of time* the door will be mechanically breached and the house secured. A DD will be deployed at the threshold to the front door if it is mechanically breached.

> *As this is being done*, McClung will pull in front of the house and begin announcing "We are the College Station Police Department! We are serving a search warrant at 925 Spring Loop!" McClung will have on his red and blue flashing lights.

60.     **Execution – *See Exhibit A*.** To understand CSPD's patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid, please watch Exhibit A.

61.     **Execution – *"Knock & Announce" is Incoherent*.** While CSPD's plan was incompetent from the start, the actual execution was even more so. The knock and announce was incompetent, unreasonable, and incoherent. The policy and constitutional requirements of the "knock and announce rule" is meant to give occupants a meaningful opportunity to: (i) hear the announcement, (ii) process the information, and (iii) have the opportunity to voluntarily comply. Here, the knock was accomplished by Defendant Officer Dakota Norris loudly pounding on the door multiple times in rapid succession. In synchronicity with the loud pounding, Defendant Norris states something that is incoherent even to a casual listener after repeatedly watching and listening to the raid video multiple times because his announce is completely muffled out. The overlapping of Defendant Norris's pounding, the *knock*, and the incoherent speech, the *announce*, make the

executed knock and announce incompetent, unreasonable, incoherent, and thus, unconstitutional because the only thing that could be heard is the loud pounding. That is, there was a knock; there was no announce, and CSPD agrees. Later, it reflected, "The knock and announce should be separate, not simultaneous." Upon information and belief, a review of prior CSPD SWAT raids will reveal the policy, practice, custom, and usage of the constitutionally inadequate, simultaneous knock and announce. Had CSPD executed the knock and announce constitutionally – that is, "separate, not simultaneous," Mark Hopkins would still be alive.

62. **Execution – "*Knock and Announce" Time is Unreasonable.*** From the "knock and announce" to physical entry of 925 South Loop, a total of a mere 20 seconds elapsed; a mere 10 seconds later, Mark Hopkins was shot and killed. Again, first, the primary objective of the 925 Spring Loop raid was the seizing of computers – not drugs. The allegations from Defendant Lovelace's investigation alleged that Lauren may be involved in laundering money for Abraham and that computers and electronic devices would identify that information. Destruction of computers (especially in the age of solid-state drives) is difficult and takes time; computers can't be flushed down the toilet like weed. Accordingly, any concern over destruction of evidence was minimal. Second, the Threat Matrix was low – either a 2 or 2.5. Even assuming the exaggerate threat score of 5, had policy and the Threat Matrix been followed, SWAT would not have been involved. Third, the time of the raid at 6:00 am requires more time when conducting a knock and announce, as the occupants could be – and were – asleep. Clearly established case law regarding time of day requires officers to use more patience when conducting raids at 6:00am. Indeed, as Alyssa and Lauren stated, they were asleep and "no college student is awake at 6 in the morning." Fourth, the time day is also critical under clearly established case law because more time is necessary to "give occupants a reasonable chance to answer the door," "avoid unnecessary harm,

panic, or embarrassment" (e.g., if occupants are undressed or otherwise unprepared), and to "minimize property damage." Had residents had an opportunity to respond to this instant raid, they would have walked right into a flash-bang being thrown at them and exploding on them because the time was unreasonable and Defendant Lee did not look where he was throwing. Fifth, there were no exigent circumstances that would justify a short period of time (*e.g.*, the destruction of evidence). Sixth, the size of the home may require more time to answer the door. While small in square footage, the Defendant Raid Officers had a layout of the rooms, and not knowing whether anyone was in the furthest bedroom or undressed, more time would have been appropriate. Seventh, the purpose of the knock-and-announce rule is to respect the privacy and dignity of individuals, such as ensuring someone has time to dress if undressed, and at 6:00 am, more time would be needed to respect this constitutional right of privacy. Indeed, females Alyssa and Lauren were scantily dressed. Eighth, the policy, reasoning, and requirement of the knock and announce under the Fourth Amendment is to "announce police's presence and purpose clearly." As set forth above, the announce was incompetent, unreasonable, incoherent, and unconstitutional because "police's presence and purpose" was not clearly stated – it was muffled out. Indeed, Alyssa and Lauren did not know it was the police – each of them thinking they were being robbed, about to be raped, or worse. When the destruction of evidence is not a concern as it was not a concern here, the knock and announce rule emphasizes reasonableness in the waiting period. Courts expect officers to consider factors such as the time of day, size of the residence, visible occupant activity, and absence of exigent circumstances, among other factors, in assessing a reasonable time and have found reasonable wait times up to **1 minute** may be reasonable in low-risk cases, especially where occupants might be in situations requiring time to respond (e.g., dressing or waking up).

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

Less than 20 seconds was unreasonable under the circumstances. Had CSPD waited a constitutionally reasonable amount of time, Mark Hopkins would still be alive.

63.    **Execution – *Announce "As this is being done…"*** Defendant McClung was in charge of making announcements and turning on the blue and red lights to warn the residents of 925 Spring Loop that a search warrant was being conducted by police. That is, he was part of the "knock and announce" to "announce police's presence and purpose clearly," pursuant to Fourth Amendment requirements. However, he arrived at the raid late and by the time he stopped, turned on his lights, and made an announcement, the Defendant Raid Officers had already breached the door, were inside, and were in the process of shooting Mark Hopkins. Had CSPD initiated this part of the "announce" *"as this [the knock] [was] being done,"* Mark Hopkins would still be alive.

64.    **SWAT's Use and Military-Style Raid is Unreasonable and Unconstitutionally Excessive**. First, as set forth above, SWAT was not approved for 925 Spring Loop and therefore, its need and its use was unnecessary and excessive – to wit:



Regardless, in its use, the Defendant Raid Officers were decked out in full tactical gear and carried 5.56 NATO caliber Colt model SMG assault rifles with a silencer, scope, light, and laser attachments, and a 5.56 NATO caliber magazine carrying NATO rounds – to wit:

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND



CSPD decided to use this style of an AR-15 assault rifle, used by the US military in conflicts such as the Vietnam War, Iraq, and Afghanistan. CSPD decided to use this style of an AR-15 assault rifle not against Pablo Escobar, the deceased Colombian drug lord and narco-terrorist but against Abraham Escobar, an unrelated, small-time college-student pot dealer; and not in a war, terrorist, or hostage situation but against college students in a densely packed neighborhood of single-family homes. The setup of the raid of 925 Spring Loop from the start created a highly predictable chance that severe injury or death would occur, and it did occur. Had CSPD not conducted a SWAT military-style raid, Mark Hopkins would still be alive.

65.    **Mechanical Breach is Unreasonable and Unconstitutionally Excessive**. As set forth herein and above, the mechanical breach by use of a battering ram was unreasonable, unnecessary, and unconstitutional. Indeed, given the ineffective "knock and announce" stated above, Alyssa and Lauren state they were awakened by the mechanical breach – not the "knock and announce." As such, from breach to death, Mark Hopkins had approximately 10 seconds before his life was taken. Had CSPD not conducted a mechanical breach and when it did, Mark Hopkins would still be alive.

66.     **Flash-bang Use is Unreasonable and Unconstitutionally Excessive.** CSPD officers entered the home by force, using a battering ram followed immediately by an M84 stun grenade or "flash-bang" (also known as a "Destructive Device" or "Diversionary Device" or "DD" for short) – the same used by the United States Armed Forces. Upon detonation, the flash-bang generates an intense heat, emits an intensely loud "bang" of 170–180 decibels, and a blinding flash of more than one million candlepower. The combination of visual and auditory stimuli enables the flash-bang to render temporary blindness, loss of hearing, disorientation, confusion, and loss of coordination and balance within a radius of ten yards for an extended period of time. Flash-bang grenades are classified as "destructive devices" with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), under the National Firearms Act (NFA), 26 U.S.C. § 5845(f), and are subject to strict regulation outlined in 27 C.F.R. § 479.11. Flash-bangs are known to destroy property, cause fires and burns, and have resulted in fatalities to officers, suspects, and civilians. And for the reasons set forth below, as used in the 925 Spring Loop raid, its use was incompetent, excessive, unreasonable, and unconstitutional. Had CSPD not used a M84 stun grenade or "flash-bang," Mark Hopkins would still be alive.

67.     **Flash-bang Use – *Clearly Established Law on Unreasonableness*.** Courts have consistently held that the use of flash-bang devices during search warrant executions must be justified by specific, credible threats that necessitate such force. In cases involving non-violent drug offenses, where no substantial risk to officer safety is present, deploying flash-bangs has been deemed improper and a violation of Fourth Amendment rights. Law enforcement agencies are advised to exercise caution and thoroughly assess the necessity of using flash-bangs, ensuring that their deployment is proportionate to the actual risks involved. More specifically, several federal courts have held that "the use of flash bang devices should be limited and is not appropriate in

Page 28 of 60

most cases." The knock and announce facilitates a "brief interlude between announcement and entry with a warrant," which may be the opportunity that an individual has to put on clothes or get out of bed. On the other hand, the flash bang device is a tactical expression of forceable entry – the force authorized by the *no-knock* entry. That is, in a no-knock warrant, force is being used and no "brief interlude" is required. It follows then that the use of a flash-bang device is antithetical to and irreconcilable with the public policy grounds supporting a knock and announce warrant. Thus, it was inappropriate  and unconstitutional here. Additionally, courts and legal scholars critical of flash-bang use against civilians have found the following: flash-bangs should not be used without explicit judicial authorization tied to the warrant application process, which was not done here; judges should evaluate the necessity of flash-bangs based on specific risks, such as threats to officer safety or destruction of evidence, which was not done here; flash-bangs should be categorically prohibited in knock-and-announce warrant executions unless exigent circumstances arise, which no such reasonable exigent circumstances existed here; and flash-bangs may be allowed in no-knock warrants, but only with a higher showing of necessity and detailed planning (e.g., ensuring no children or elderly are present, having fire extinguishers ready, etc.), which was not only not done here but also did not apply at 925 Spring Loop because it was ***not*** a *no-knock* raid. Had CSPD not used a M84 stun grenade or "flash-bang" and followed clearly established law, Mark Hopkins would still be alive.

68.    **CSPD's Training and Policy on Flash-bangs – *None*.** To be clear, when asked whether CSPD had any policies and procedures regarding flash-bangs, they responded: "None" and produced zero (0) documents. As there are no policies and procedures, aside from the "*how"* to use a flash-bang, there is no training or supervision on the *who, what, where, when, and why* to use flash-bangs consistent with constitutional standards or even law enforcement guidance and

authorities. What's more, flash-bang or DD was not stated in the search warrant. Accordingly, there was zero judicial oversight of CSPD's use of the flash-bang because no one other than the CSPD knew they would use a destructive device on college students at 6:00 am. If police maintain a supply of military-style weaponry, they are likely to perceive circumstances to implement its use, as was the case here. Sadly, the police were left in charge of policing the police because CSPD has zero policies and procedures on proper, constitutional use of flash-bang devices. And, CSPD's supervisors, Defendant Couch, and City Counsel knew there were no policies and no training regarding the constitutional use of flash-bang grenades on civilians. Had CSPD not used a M84 stun grenade or "flash-bang" and had constitutional policies on proper flash-bang use, Mark Hopkins would still be alive.

69.     **What CSPD's Training and Policy on Flash-bangs Should Look Like –** *See NTOA.* CSPD claims to be accredited by the Commission on Accreditation for Law Enforcement Agencies, Inc. (CALEA). CALEA establishes comprehensive standards for law enforcement agencies to promote professional excellence. While CALEA's standards encompass various aspects of law enforcement operations, including the use of force and compliance with constitutional requirements, they do not provide explicit guidelines on the deployment of specific devices such as flashbang grenades during civilian raids. Given the absence of specific CALEA guidelines on flashbang devices, law enforcement agencies often refer to recommendations from other authoritative bodies. For instance, the National Tactical Officers Association (NTOA) provides guidance on the use of flash-bangs or "Flash Sound Diversionary Devices (FSDDs)" as NTOA calls them, advising that their deployment should be limited to situations where there is a clear tactical advantage, and emphasizing the importance of thorough risk assessment and adherence to established protocols. NTOA is a prominent organization that provides training,

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

resources, and guidelines for law enforcement agencies, particularly in tactical operations. Regarding the use of flash-bang grenades, NTOA emphasizes the following points:

- Situations Requiring a Clear Tactical Advantage: Flash-bangs should only be used in operations where their deployment provides a specific and critical benefit, such as:

  o Disorienting armed or dangerous suspects to reduce the risk of harm to officers and civilians;

  o Gaining a split-second tactical advantage in high-risk situations like hostage rescues, active shooter scenarios, or raids targeting heavily fortified locations; and

  o The devices are not appropriate for routine operations or situations lacking a clear and immediate threat.

  o *Instant Case:* Here, there was no specific and critical advantage because the residents were not "dangerous suspects," it was not a "high risk situation," and there was no "clear and immediate threat."

- Thorough Risk Assessment: Before deploying flash-bangs, a detailed evaluation of potential risks and benefits must be conducted. This includes:

  o Assessing the target environment: Are there flammable materials, children, elderly individuals, or people with known medical conditions that could be harmed by the device?

  o Considering unintended consequences: Could the device cause property damage, physical injuries, or fatalities? Could it escalate the situation unnecessarily?

  o Weighing alternatives: Can the tactical objective be achieved using less force or alternative tools?

  o *Instant Case:* Here, there was no investigation into whether the residents had any medical condition or other houseguests that could be harmed, there was no consideration as to whether "it [could] escalate the situation unnecessarily" – which it did, and less force and other tools could have accomplished the same objective without the death of Mark Hopkins.

- Adherence to Established Protocols: Proper deployment requires strict adherence to policies and training to minimize risks and ensure accountability. This includes:

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

- o Pre-deployment planning: Ensuring officers are trained in using flash-bangs and understand the circumstances in which they should be deployed.

- o Command oversight: Tactical commanders should approve the use of FSDDs in specific operations, except in emergencies requiring immediate action.

- o Documentation and review: Agencies should record the use of FSDDs, including the circumstances, decision-making process, and post-incident outcomes, for accountability and potential legal review.

- o ***Instant Case:*** Here, there were no policies and procedures regulating, training, and supervising appropriate use of flash-bangs – none. CSPD was free to use at will, with no constitutional oversight.

- Underlying Principles:

  - o Minimizing Harm: The goal is to use flash-bangs as a non-lethal method to reduce threats, not to cause harm or escalate the situation unnecessarily. Careful deployment minimizes the risk of injuries, fatalities, or constitutional violations.

  - o Proportionality: The use of force, including flash-bangs, must be proportional to the threat posed by the situation. Deploying these devices in low-risk scenarios, such as routine drug raids without evidence of armed resistance, is strongly discouraged.

  - o Public Trust and Accountability: Excessive or inappropriate use of flash-bangs can erode community trust in law enforcement. Strict protocols and transparent review processes help maintain public confidence.

  - o ***Instant Case:*** Here, the clearly established authority on proper use of flash-bangs dictates that it should not have been used in the 925 Spring Loop raid because it was disproportional to threat posed  and created a highly predictable tendency to "escalate the situation," which is exactly what happened.

Had CSPD not used a M84 stun grenade or "flash-bang," had constitutional policies on proper flash-bang use, and relied on authoritative bodies like the National Tactical Officers Association's guidance on proper flash-bang use, Mark Hopkins would still be alive.

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

70.     **Flash-bang's Physical Effects.** Flash-bangs cause disorientation. The duration of disorientation caused by a flash-bang (flash sound diversionary device, or FSDD) depends on several factors, including the design of the device, the individual's proximity to it, and environmental conditions. However, general research and tactical guidelines suggest the following:

- **Immediate Effects (Seconds):**

  o   **Blinding Flash**: The intense flash of light (~6–8 million candela) overwhelms the photoreceptors in the eyes, causing temporary blindness that typically lasts **5–15 seconds**, depending on the lighting conditions and proximity to the device.

  o   **Deafening Bang**: The sound pressure, often exceeding **170-180 decibels**, disrupts the inner ear, leading to temporary hearing loss or ringing (tinnitus) that can last **a few minutes to hours**. The shockwave also disorients balance and spatial awareness. By way of comparison of **170-180 decibels**, see below:

| Environmental Noise | |
|---|---|
| Weakest sound heard | 0dB |
| Whisper Quiet Library | 30dB |
| Normal conversation (3-5') | 60-70dB |
| Telephone dial tone | 80dB |
| City Traffic (inside car) | 85dB |
| Train whistle at 500', Truck Traffic | 90dB |
| Subway train at 200' | 95dB |
| *Level at which sustained exposure may result in hearing loss* | *90 - 95dB* |
| Power mower at 3' | 107dB |
| Snowmobile, Motorcycle | 100dB |
| Power saw at 3' | 110dB |
| Sandblasting, Loud Rock Concert | 115dB |
| *Pain begins* | *125dB* |
| Pneumatic riveter at 4' | 125dB |
| *Even short term exposure can cause permanent damage - Loudest recommended exposure WITH hearing protection* | *140dB* |
| Jet engine at 100', Gun Blast | 140dB |
| Death of hearing tissue | 180dB |
| Loudest sound possible | 194dB |

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

Here, even in an adjacent room, 20 feet away, with a closed standard interior door, the sound level of a flash-bang could be approximately **126-142 dB**. Even at these reduced levels, the sound would still be extremely loud and capable of causing temporary or permanent hearing damage. For context: 125 dB: threshold of pain and 130-140 dB: similar to a jet engine at close range or a gunshot. The sound level would still be high enough to cause significant disorientation, particularly if the occupants were unaware of the flash-bang's detonation.

- **Secondary Effects:**

  o **Cognitive Disruption**: The sensory overload causes confusion and inability to process information, typically lasting **10–20 seconds** after detonation. In stressful scenarios, this period can extend due to heightened adrenaline and fear.

  o **Physical Recovery**: Some individuals may experience lingering effects such as headaches, nausea, or disorientation for **minutes or longer**, especially if they are in close proximity to the blast.

- **Factors Influencing Disorientation:**

  o Dark environments amplify the disorienting effects of the flash.

  o Confined spaces enhance the sound and pressure effects, increasing disorientation.

Had CSPD not used a M84 stun grenade or "flash-bang" with its known disorienting effects, Mark Hopkins would still be alive.

71. **CSPD's Use of the Flash-bang on Mark, Alyssa, and Lauren.** As confirmed by Alyssa in every statement since the killing of Mark Hopkins, Mark and Alyssa were asleep at 6:00 am. Both were awakened and stunned by the mechanical breach and simultaneous explosion of the flash-bang grenade. During the commotion, they never heard any knocking or attempt by the Defendant Raid Officers to identify themselves as police officers. Instead, Mark and Alyssa believed that burglars or worse had broken into their home. Mark told Alyssa to call 911, and she struggled to find her phone in a panic. Alyssa hid in the closet as Mark grabbed his shotgun. CSPD forced the bedroom door open, and Alyssa did not hear the unknown persons assaulting the home announce or identify themselves as police officers as they entered the room. Alyssa then heard

Page 34 of 60

shots fired immediately upon entry of the bedroom and witnessed Mark fall to the ground after he was repeatedly struck in the face by gunfire.

> **Question: How is it possible that Mark and Alyssa did *not* know it was the police when, as alleged by CSPD, they stated "police" loudly, multiple times?**
>
> ***Answer: CSPD's flash-bang worked as intended. It produced it's intended design and result of disorienting Mark and Alyssa when they were awakened to the sound of a "jet engine" going off in their tiny bedroom, a "confined space," "in the dark," having been startled from sleep, without their glasses on, "disrupting their inner ears," "disorienting their balance and spatial awareness," "overloading their senses," and "causing confusion and an inability to process information for <u>10-20 seconds</u>." Indeed, from detonation of the flash-bang to the death of Mark Hopkins, a mere 11 seconds elapsed. While Mark Hopkins cried out to "Call 911!," what he didn't know, couldn't know, but desperately need to know, because of CSPD's flash-bang, was that he was about to be killed by the very 911 from whom he was crying out for help.*** Clearly, Mark and Alyssa were disoriented. Who hides in the closet and attempts a shootout with law enforcement? No one.

CSPD's use of the flash-bang on Mark and Alyssa in the 925 Spring Loop raid was incompetent, excessive, unreasonable, and unconstitutional. And, had CSPD not used a M84 stun grenade or "flash-bang," Mark Hopkins would still be alive and Alyssa would not have been injured.

72.    **Aftermath – *Interrogation*.** Mark died as a result of the gunfire. Alyssa and Lauren were handcuffed by officers, detained, and questioned for at least eight hours. During the detention and interrogations, the CSPD offices repeatedly, and falsely, accused Mark of being engaged in criminal conduct, in an effort to justify the killing of Mark.

73.    **Aftermath – *Norris Lawyers-Up and Makes False Statements*.** Following Defendant Norris's killing of Mark Hopkins, he meets with his lawyer who then prepares him for his statement to the Texas Rangers, and, upon information and belief, watches his body cam footage multiple times to craft his statement. Therein and under oath, Defendant Norris states the following:

Page 35 of 60

***The briefing*** included reviewing the floor plan of 925 Spring Loop and ***cautions that the occupants of the locations to be searched are known to carry or possess firearms.***

While making entry, I scanned the bedroom until I observed an adult male inside the connecting closet aiming a long gun of some sort at me. ***I observed the male shoot a round off from the gun, while also hearing the gun go off and feeling the percussion of the firearm discharging.*** At this point, I was in fear for my life, the life of my fellow officers inside the structure, and the lives of any innocents left inside the structure as this subject had not only exhibited a deadly weapon but also used deadly force. Due to this, I aimed my SWAT issued AR rifle at the adult male with a gun, and I returned fire multiple times until I observed the male drop the gun and fall to the ground. My use of deadly force was immediately necessary to prevent the further threat of serious bodily injury or death to myself or others.

Emphasis added. The above statements are false for the following reasons:

- First, the briefing did not state anything about "occupants" – plural.  The only discussion regarding the "unknown" possibility of guns was "if Escobar is present." CSPD knew Abraham Escobar was *not* present. However, if it is *now* CSPD's position that "occupants" – including Mark Hopkins "***are known to carry or possess firearms***" despite no Threat Assessment or PowerPoint slide corroborating same, then CSPD further knew that it would be inappropriate to use a flash-bang given the highly predictable chance of escalating the situation to deadly force, which it did. That is, either Defendant Norris is lying about this alleged knowledge being attributable to Mark Hopkins, or CSPD is admitting to their incompetent use of the flash-bang.

- Second, in his paragraph beginning with, "While making entry…" and ending with "…fall to the ground," Defendant Norris is suggesting that some considerable time elapsed for deliberative thought – perception, contemplation, decision, and execution. However, upon review of Exhibit A, the shooting of Mark Hopkins was less than one second upon entry of the bedroom – a speed that is wholly unsupported by any human factors perception reaction study. There was no deliberative process; the shooting was simultaneous with entry.

- Third, upon information and belief, Defendant Norris fired first and the return-firing of Mark's shotgun was the result of an involuntary muscle contraction or neurological shock or disruption followed by an involuntary muscle contraction upon being hit by a bullet or bullets.

74.    **Aftermath –** *No Discipline, No Termination, and No Training*. Despite the

unlawful search and seizure, and the ultimately fatal shooting of Mark, none of the Defendant Raid

Officers were terminated or even disciplined. Furthermore, none of the Defendant Raid Officers

were trained before or after this patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid.

75.    **Aftermath – *Ratification***. Despite the unlawful search and seizure, excessive force, invasion of privacy, and the ultimately fatal shooting of Mark, all of the action and inactions of the Defendant Raid Officers – including Defendant Norris's constitutionally inadequate knock and announce, use of a battering ram, shooting of Mark, and Defendant Le's use of the flash-bang – were ratified and approved by all supervising officer, Defendant Crouch, and CSPD.

76.    **CSPD – *Policies, Practices, Customs, and Usage.*** CSPD's actions and inactions are further unconstitutional for the following reasons:

- The CSPD's officers' actions tragically took Mark's life and those actions were the logical and unconstitutional consequence of the CSPD's unlawful and illegal pattern, practice, custom, and de facto policy of using unreasonable searches, seizures, invasion of privacy, and excessive force on suspects.

- The CSPD's written policy on searches and seizures or use of force is not the de facto policy of the CSPD. The de facto policy is that which these officers employed when they inadequately knocked and announced their presence at Mark's apartment and instead decided to immediately enter the apartment by breaking down the door, detonating a flashbang device, and immediately start shooting, without any constitutionally adequate warning or making any effort to de-escalate the situation.

- The CSPD has a pattern, practice, history, and custom of conducting such illegal searches and seizures and using excessive force, including conducting searches with guns drawn, when there is no imminent threat of bodily harm or other justifiable reason to do so. In short, the CSPD train its officers to enter a residence like it is a war zone and to shoot on sight. The CSPD does not provide adequate training to its officers as it relates to proper searches and seizures, whether with a warrant or without one. The CSPD also does not provide adequate training to its officers as it relates to the use of deadly force and the use of non-deadly force.

- The College Station City Council, the City's final policymaker, Chief Couch and the City knew or should have known that the training provided to its officers was inadequate or nonexistent.

- The officers should have been trained to deal with citizens posing no threat of imminent bodily harm to them, other officers or the general public.

- The officers entered the apartment by breaking the door down, and detonating a flash-bang device, with their weapons drawn, without any evaluation of the situation, before or after entering the apartment. The officers simply opened fire without having any knowledge of the true situation. Because these officers were ill-trained, they all defaulted to the defective CSPD policy: enter a residence like it is a war zone and to shoot on sight.

- This terrible tragedy was 100% preventable. Mark and his girlfriend were asleep in Mark's room. They had no idea what was happening. They were not engaged in any illegal activity and were not attempting to harm anyone. Nonetheless, because of the reckless and intentional violations of Mark's constitutional rights, Mark is now dead.

- Mark posed no risk to any of the officers or any other person in the immediate area. Mark did not attempt to harm the officers and was not committing a crime when Defendant Officer Norris shot him multiple times. Instead, Mark was legally defending himself and others against an unknown intruder.

- The officers unlawful and unwarranted acts, lack of training and the official customs or policies of the CSPD were the proximate cause of Mark's death. At all times material hereto, the CSPD officers were acting in the scope of their employment as agents, servants, and employees of the CSPD, a part of Defendant, the City of College Station, under color of state law.

77.    **Mark Hopkins's Death And Its Impact On His Family.** As a direct and proximate result of Defendants' conduct, Plaintiffs have sustained substantial permanent damages. Mark was twenty-two (22) years old when he was murdered by Defendant Officer Norris. Mark leaves behind his parents, his sister, and the love of his life, Alyssa. Mark's parents have suffered a significant loss from the death of their son by virtue of the destruction of the parent-child relationship, including the right to love, affection, solace, comfort, companionship, society, emotional support, and happiness. Mark's parents have suffered and will continue to suffer anguish, grief, and sorrow as a result of Mark's death and are likely to continue to suffer those

losses for a long time in the future. For these losses, Plaintiffs seek damages in a sum in excess of the minimum jurisdictional limits of the court.

78.    **Alyssa's Injuries and Damages.** Alyssa was in the Apartment, was a target of the unconstitutional battering ram and flash-bang use, and in the line of fire at the time of the shooting of Mark Hopkins. Indeed, the only thing separating her from CSPD's bullets was Mark's courage and drywall. What's more, Alyssa experienced CSPD's flash-bang, was awakened to the sound of a "jet engine" going off in her vicinity, experienced sound pressure that disrupted her inner ears, experienced temporary hearing loss and ringing, experienced balance-disorientation and spatial awareness, was startled from sleep, experienced overloading of her senses, and experienced confusion and an inability to process information when CSPD's M84 grenade exploded near her. While Alyssa was not ultimately shot, being the victim of CSPD's flash-bang, being in the line of fire, and witnessing the death of her boyfriend – the man she woke up next to for months – caused her to be traumatized and in shock and suffer direct personal injury in the form of pain, mental anguish, and severe emotional distress. In short, CSPD's and Defendant Raid Officers' excessive force is no different from those of the Hopkins. Alyssa was not a mere "witness to police action," she was as much a target of CSPD's and Defendant Raid Officers' excessive force as Mark; the only difference is that Alyssa was not hit by CSPD's bullets—though CSPD's bullets missed her by a few feet.  For her physical pain and her psychological damages, Plaintiffs seek damages in a sum in excess of the minimum jurisdictional limits of the court.

## VII.    CLAIMS

79.    Plaintiff re-alleges all of the allegations in the previous paragraphs, as though fully set forth herein.

80.    Plaintiff hereby makes the following claims and invokes the following federal

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

statutes and Constitutional rights – to wit:

81.    **42 U.S.C 1983.** "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

82.    ***Monell* Liability.** A municipality may be held liable under 42 U.S.C. § 1983 for an official policy or custom which is the moving force behind a constitutional violation. *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658 (1978).

83.    **The Fourth Amendment of the U.S. Constitution.** "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

84.    **The Fourteenth Amendment of the U.S. Constitution, Section 1.** "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Specifically, Plaintiff invokes his Constitutional rights under the 4th and 14th Amendments to the United States Constitution to be free from, *inter alia*, unreasonable searches and seizures, invasion of privacy, and excessive force.

85. **42 U.S.C 1988(b).** "In any action or proceeding to enforce a provision of sections …1983, [and] 1985 … of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction."

86. **Vicarious Liability.** Defendants' conduct, actions, and/or inactions, individually and in concert with others are liable under theories of individual liability, direct liability, *Monell* liability, and vicarious liability including but not limited to: Aiding & Abetting; Assisting & Participating; Concert of Action; Joint Cooperation; Actual Authority; Apparent Authority; Conspiracy; and Ratification. Defendants, each of them individually, jointly, and/or collectively, hid behind the authority of the law and were acting under color of state law, ordinance and/or regulation, statutes, custom, and usages of CSPD.

87. **Conspiracy[10].** Conspirators in this case include Defendant Raid Officers,

---

[10] *See Hanrahan v. Hampton*, 446 U.S. 754 (1980). A civil conspiracy is a "combination of two or more persons acting in concert to commit an individual act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties "to inflict a wrong against or injury upon another," and "an overt act that results in damage." In order to prove the existence of a civil conspiracy, a plaintiff is not required to provide direct evidence of the agreement between the conspirators; "[c]ircumstantial evidence may provide adequate proof of conspiracy." Thus, the question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can "infer from the circumstances [that the alleged conspirators] had a 'meeting of the minds' and thus reached an understanding" to achieve the conspiracy's objectives … A plaintiff seeking redress need not prove that each participant in a conspiracy knew the "exact limits of the illegal plan or the identity of all participants therein." … An express agreement among all the conspirators is not a necessary element of a civil conspiracy. The participants in the conspiracy must share the general conspiratorial objective, but they need not know all the details of the plan designed to achieve the objective or possess the same motives for designing the intended conspiratorial result. To demonstrate the existence of a conspiratorial agreement, it simply must be shown that there was

Defendant Crouch, and CSPD.

88.     **Clearly Established.** At all times material hereto, the laws regarding, *inter alia*, unreasonable searches and seizures, invasion of privacy, and excessive force were clearly established within both the Fifth Circuit, Southern District of Texas, and state and federal law prior to the time of Defendants' patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid.

89.     **Causation.** Defendants' conduct, actions, and/or inactions were the moving force, directly caused, proximately caused, and/or were a substantial factor in causing the Constitutionally-violative injuries and damages as suffered by Plaintiffs, as set forth more fully below.

90.     **Texas Wrongful Death and Survivorship Claim.** Plaintiffs are the surviving parents of Decedent Mark and are beneficiaries entitled to bring this action under the Texas Wrongful Death Act, Tex. Civ. Prac. & Rem. Code Ann. §71.002. Mark was not married and had no children; thus, his parents are his heirs. An Heir is entitled to bring this action under the Texas Survival Statute, Tex. Civ. Prac. & Rem. Code Ann. §71.021, and as heirs, Plaintiffs are entitled to Decedent's estate under the statutes of descent and distribution.  Tex. Prob. Code § 38, §45, *et seq.*

## VIII.  <u>CAUSES OF ACTION</u>

**A.     COUNT 1: Cause of Action against Defendant Raid Officers under 42 U.S.C. § 1983 for Violation of the Plaintiffs' Fourth Amendment right to be free from Unreasonable Search and Seizure.**

91.     Plaintiffs re-allege all of the allegations in the previous paragraphs, as though fully

---

"a single plan, the essential nature and general scope of which [was] known to each person who is to be held responsible for its consequences."

set forth herein.

92.    The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Reasonableness is the ultimate touchstone of the Fourth Amendment and among the factors to be considered in assessing the reasonableness of a search or seizure is an officer's method of entry into a home. *Trent v. Wade*, 776 F.3d 368, 379 (5th Cir. 2015) (citing *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995)). Before police officers can attempt a forcible entry of a dwelling, they "must knock on the door and announce their identity and purpose." *Richards v. Wisconsin*, 520 U.S. 385, 387 (1997) (citing *Wilson v. Arkansas*, 514 U.S. 927 (1995)).

93.    This "knock-and-announce" rule incorporates common-law principles that a resident should have the opportunity to: (1) comply with the law and obey an officer's lawful demand to enter; (2) avoid the destruction of property occasioned by a forcible entry; and (3) pull on clothes or get out of bed. *Trent*, 776 F.3d at 379 (quoting *Richards*, 520 U.S. at 393 n.5). The rule therefore requires officers to knock and announce their presence and wait a reasonable amount of time before a forcible entry.  Only "when law enforcement concerns outweigh personal privacy interests" are officers not required to comply with the rule. *United States v. Cantu*, 230 F.3d 148, 151 (5th Cir. 2000). To justify an exception to the knock-and-announce rule, "the police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *United States v. Washington*, 340 F.3d 222, 226 (5th Cir. 2003) (quoting *Richards*, 520 U.S. at

Page 43 of 60

394).  The rule and its exception has been clearly established for nearly 30 years.  *Trent,* 776 F.3d at 383 ("Any reasonable officer would understand that, because the knock-and-announce rule serves to alert the occupants of a home of an impending lawful intrusion, the futility justification requires reasonable suspicion that the occupants of the home to be searched are already aware of the officer's presence" and "any reasonable officer would know that he was violating the rule if he did not have reasonable suspicion that knocking and announcing would be dangerous or futile or that it would inhibit effective investigation of the crime.").

94.    The CSPD officers engaged in an unreasonable search of Mark's apartment on February 8, 2023 when they failed to, without any justification, to constitutionally knock and announce their presence.  Despite a constitutional obligation to do so, the CSPD officers instead broke down the front door of the apartment and detonated a flash-bang device inside the apartment.

95.    Having done so, all of the CSPD officers immediately entered the apartment with their guns drawn.  Even inside the apartment, the CSPD officers made no effort to determine who was inside the apartment and whether their target was present.  Instead, they surged forward into Mark's bedroom and immediately shot him dead.

96.    The obligation to knock and announce their presence was clearly established on February 8, 2023.  Thus, the CSPD officers knew what they were doing was wrong when they did it.

97.    The failure to constitutionally knock and announce their presence was the moving force, directly caused, proximately caused, and/or was a substantial factor in causing the violation of Mark's and Alyssa's constitutional rights.

98.    As a result of the CSPD officers' violations of the constitutional standards set forth herein, Plaintiffs seek compensation from the Defendants as set forth more specifically in the section of this Complaint entitled "Damages."

**B.    COUNT 2: Cause of Action against Defendant Officer Norris under 42 U.S.C. § 1983 for Violation of the Plaintiffs' Fourth Amendment right to be free from Excessive, Deadly Force.**

99.    Plaintiff re-alleges all of the allegations in the previous paragraphs, as though fully set forth herein.

100.    Defendant Officer Norris, acting under color of law, used unreasonably excessive and deadly force and killed Mark without any justification for doing so.

101.    Defendant Officer Norris's actions violated Mark's constitutional, Fourth Amendment right to be free from excessive, deadly force. This right was clearly established at the time of the shooting.

102.    Nothing that Mark did pose an imminent threat to the safety of Defendant Officer Norris or anyone else.

103.    Defendant Officer Norris's conduct was objectively unreasonable as Mark presented no physical threat to either Defendant Officer Norris, his fellow officers, or anyone else and Mark did nothing which could have placed a reasonable officer in fear for his life or the life of anyone else.

104.    As a result of Defendant Officer Norris's unjustified actions, Mark suffered an injury, which resulted directly and only from the use of force, that was clearly excessive and the force used was objectively unreasonable and in violation of clearly established law.

105.    Defendant Officer Norris's duties and responsibilities on February 8, 2023 were well defined by applicable law and he knew or reasonably should have known that his conduct

was below the standard prescribed by such law. Defendant Officer Norris's conduct violated a clearly established constitutional right—the right to be free from excessive force—that was established well before Norris shot and killed Mark. *See, e.g., Reyes v. Bridgewater*, 362 Fed. Appx. 403, 409 (5th Cir. 2009) ("The cases on deadly force are clear: an officer cannot use deadly force without an immediate serious threat to himself or others.").

106.    As a result of Defendant Officer Norris's violation of the constitutional standard set forth herein, Plaintiffs seek compensation from the Defendants as set forth more specifically in the section of this Complaint entitled "Damages."

**C.    COUNT 3: Cause of Action against Defendant Raid Officers under 42 U.S.C. § 1983 for Violation of the Plaintiffs' Fourth Amendment right to be free from Excessive Force.**

107.    Plaintiff re-alleges all of the allegations in the previous paragraphs, as though fully set forth herein.

108.    Defendant Raid Officers, acting under color of law, used unreasonably excessive force in using the battering ram and M84 flash-bang grenade against Mark and Alyssa without any justification for doing so.

109.    Defendant Raid Officers actions violated Mark's and Alyssa's constitutional, Fourth Amendment right to be free from excessive force. This right was clearly established at the time of the shooting.

110.    Nothing that Mark and Alyssa did pose an imminent threat to the safety of Defendant Raid Officers or anyone else.

111.    Defendant Raid Officers' conduct was objectively unreasonable as Mark and Alyssa presented no physical threat to either Defendant Officer Norris, Defendant Raid Officers,

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

or anyone else and Mark and Alyssa did nothing which could have placed a reasonable officer in fear for his life or the life of anyone else.

112.    As a result of Defendant Raid Officers' unjustified actions, Mark and Alyssa suffered an injury, which resulted directly and only from the use of force, that was clearly excessive and the force used was objectively unreasonable and in violation of clearly established law.

113.    Defendant Raid Officers' duties and responsibilities on February 8, 2023 were well defined by applicable law and they knew or reasonably should have known that their conduct was below the standard prescribed by such law. Defendant Raid Officers' conduct violated a clearly established constitutional right—the right to be free from excessive force—that was established well before the patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid, use of a battering ram, and use of a flash-bang that injured Alyssa and was the moving force behind Mark's death.

114.    As a result of Defendant Raid Officers' violation of the constitutional standard set forth herein, Plaintiffs seek compensation from the Defendants as set forth more specifically in the section of this Complaint entitled "Damages."

**D.    COUNT 4: Claim against Defendant Raid Officers under 42 U.S.C. § 1983 as Supervisors or Bystanders for violation of Mark's and Alyssa's Fourth Amendment right to be free from Excessive Force.**

115.    Plaintiff re-alleges all of the allegations in the previous paragraphs, as though fully set forth herein.

116.    All of the Defendant Raid Officers are likewise liable for the illegal and unreasonable search and Defendant Officer Norris's use of excessive, deadly force as either a supervisor or as a bystander.  A claim of bystander liability requires the claimant

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

to prove (1) the by-standing officer knew that a fellow officer was violating an individual's constitutional rights, and (2) the officer had a reasonable opportunity to prevent the violation but chose not to act. Supervisory liability requires a showing that the supervisor acted, or failed to act, with deliberate indifference to their subordinates' constitutional violations. Both supervisory and bystander liability under Section 1983 are based on the principle that, by choosing not to intervene and prevent unconstitutional conduct, the passive officer effectively participates in unconstitutional acts.

117.    All of the CSPD officers, Defendant Raid Officers here, knew or should have known that they were required to constitutionally knock and announce their presence before executing the warrant.  But none of them did.  And the failure to do so was not only obvious, but pre-planned.  All of these officers were involved with the planning or knew of the plan to enter Mark's and Alyssa's apartment, yet none of them made any effort to stop it.

118.    The same is true with regard to Defendant Officer Norris's use of force. The CSPD officers, Defendant Raid Officers here, knew that Defendant Officer Norris was entering the apartment with his gun drawn.  Knowing of the plan as to how the apartment would be entered, along with the plans to break down the door and use a flash-bang device, it should have come as no surprise that the officer, with his gun drawn, would use it.  Yet, no officer made any effort to stop it.

119.    At all times, there was adequate time and opportunity for all of the CSPD officers to intervene to prevent the illegal search and entry into the apartment and the use of plainly excessive force and to prevent Mark's death and Alyssa's injuries.

120.    By choosing not to intervene, all of the Defendant Raid Officers effectively participated in the unconstitutional acts.

121.    Since at least 1995, it has been clearly established in the Fifth Circuit that an individual officer is subject to bystander liability under Section 1983 if he or she knew a constitutional violation was being committed by a fellow officer and had a reasonable opportunity to prevent the harm. *Hamilton v. Kindred*, 845 F.3d 659, 663 (5th Cir. 2017) (citing *Hale v. Townley*, 45 F.3d 914, 918 (5th Cir. 1995), for principle that "it was clearly established in the Fifth Circuit that an officer could be liable as a bystander in a case involving excessive force if he knew a constitutional violation was taking place and had a reasonable opportunity to prevent the harm.").  Likewise, it was clearly established at the time of the incident that a supervisor is subject to liability under Section 1983 where the supervisor, with deliberate indifference, failed to act or otherwise prevent the constitutional violations perpetrated by their subordinates. *See, e.g., Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011).

122.    As a direct and proximate result of all of the CSPD officers' failures to prevent the violations of Mark's and Alyssa's constitutional rights, Plaintiffs incurred extreme pain and injuries for which they seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**E.    COUNT 5: Claim against individual officers under 42 U.S.C. § 1983 for violation of Mark's and Alyssa's Fourth Amendment right to be free from Invasion of Privacy.**

123.    Plaintiff re-alleges all of the allegations in the previous paragraphs, as though fully set forth herein.

124.    Defendant Raid Officers did not constitutionally knock and announce before entering Mark's and Alyssa's apartment.

125.    Adequately and constitutionally knocking and announcing their presence and purpose would not have endangered Defendant Raid Officers.

126.    Defendant Raid Officers did not have a reasonable suspicion that knocking and announcing would be dangerous or futile or inhibit the investigation of a crime.

127.    Defendant Raid Officers violated Mark's and Alyssa's Fourth and Fourteenth Amendment rights by entering the apartment without adequately and constitutionally knocking and announcing and entering without consent and pursuant to a false search warrant.

128.    As a direct and proximate result of all of the CSPD Defendant Raid Officers' unconstitutional invasion of Mark's and Alyssa's privacy, Mark was fatally shot, Alyssa was injured, and Plaintiffs incurred extreme pain and injuries for which they seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**F.    COUNT 6: Cause of Action against the City of College Station under 42 U.S.C. § 1983 for violation of the Plaintiffs' Fourth Amendment rights for Failing To Train, Supervise, or Discipline Its Officers and for Ultimately Ratifying their conduct.**

129.    Plaintiff re-alleges all of the allegations in the previous paragraphs, as though fully set forth herein.

130.    The City of College Station is liable for all damages suffered by the Plaintiffs pursuant to *Monell* and 42 U.S.C. § 1983, based on official policies or customs of the CSPD of which the City Council, the City Manager, the Mayor, and the Chief of Police all had actual or

constructive knowledge, and which were moving forces behind the constitutional violations alleged herein. *See Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658 (1978).

131.    The City of College Station and the CSPD, by and through the College Station City Council, have an inadequate policy of training officers regarding the following areas of law enforcement:

      a.    The use of proper and appropriate search and seizure procedures.

      b.    The use of excessive and/or deadly force.

      c.    The proper use of less deadly force.

132.    Defendant Raid Officers at the scene of the shooting incident were acting under color of law and acting pursuant to customs, practices, and policies of the City of College Station and the CSPD in regard to their search of Mark's and Alyssa's apartment and use of deadly force, all as authorized and/or ratified by the College Station City Council and Chief Couch.  Mark and Alyssa were deprived of rights and privileges secured to him by the United States Constitution and by other laws of the United States, when the City of College Station failed to provide proper training, adequate supervision, or discipline in dealing with individuals such as Mark in violation of 42 U.S.C. §1983 and related provisions of federal law and in violation of the above cited constitutional provisions.

133.    The City of College Station's policy of inadequate and improper training of police officers on proper search procedures and the use of excessive and/or deadly force, resulted in the constitutional deprivations and damages alleged herein.

134.    The City of College Station and the CSPD failed to adequately train and failed to adequately supervise or discipline the officers, despite their unlawful conduct.

135.    The CSPD officers' lack of training led to the unreasonable search and immediate use of excessive and deadly force, all of which was the moving force behind the death of Mark, injuries to Alyssa, and Plaintiffs' damages.

136.    The City trains its officer on search and seizure procedures, and this training serves as the foundation for the methods employed in any situation the officers may encounter.  The City trains its officers that so long as they have a warrant, there is no requirement on their part to constitutionally knock or announce their presence.  In other words, the City trains its officers to default to constitutionally unreasonably search methods when there is a warrant.  Since the knock-and-announce rule has been a clearly established requirement of any search for at least thirty years and is the rule (as opposed to an exception) to be followed in all cases, the City's training of its officers to perform searches in this manner is unconstitutional.

137.    The City also trains its officers on threat assessment and that threat assessment serves as the foundational analysis for the level of force to be used in any particular situation.  In doing so, the City trains its officers that they may use deadly force when *they believe* a suspect poses a threat of serious bodily harm or death to the officer or others.  In other words, the City trains its officers that the use of deadly force is objectively reasonable even when based on the officers' subjective evaluation, meaning that officers may use deadly force when no immediate threat of harm actually exists, so long as they subjectively perceive such a threat.  Since deadly force is not justified "[w]here the suspect poses *no immediate threat* to the officer and no threat to others," *Cole v. Carson,* 935 F.3d 444, 453 (5th Cir. 2019) (en banc) (emphasis added) (quoting *Tennessee v. Garner,* 471 U.S. 1, 11 (1985), training its officers in such a way is unconstitutional.

138.    The CSPD has longstanding records of not providing its officers with adequate training on search procedures, flash-bang use, or use of force techniques all of which are intended to prevent instances of excessive and deadly force and extrajudicial killings by CSPD officers.

139.    The actual practice or custom of the CSPD regarding the use of deadly force is to encourage officers to enter a residence like they are in a war zone and immediately start shooting.

140.    As a result of the lack of training and the official custom or policies of the CSPD, there have been a number of deadly police shootings of unarmed suspects.

141.    There exists a persistent, widespread practice of police shootings that result from the training or lack thereof, received by CSPD officers.  Upon information and belief, CSPD officers are trained by individuals with little or no experience working in the field.

142.    Moreover, even assuming there is no pattern and practice of CSPD officers to bypass constitutional "knock-and-announce" search procedures and immediately employ deadly force, the City's failure to train its officers regarding search procedures, flash-bang use, and the use of excessive and/or deadly force qualifies for the "single-incident exception" to *Monell*'s requirements because the failure to train its officers in these areas presents an obvious potential for a constitutional violation.  In short, the failure to train CPSD's officers in these areas made it apparent to the City's policymaker that the constitutional violations at issue here were the highly predictable outcome of the City's conduct.

143.    The City then ratified its officers' conduct by failing or refusing to discipline these officers or even provide them additional training.  All officers involved in the raid on and death of Mark Hopkins remain employed by CSPD today.  The CSPD's after-the-fact ratification shows that the City supported these unconstitutional actions at the time they occurred.

144.    CPSD's conduct confirms that it affirmatively acquiesced in, adopted, or sanctioned these officers' conduct and failed to actively enforce its own policies and procedures. It also tends to suggest that it and other policymakers found no inadequacies in the officer's conduct. Such affirmative official action lends itself to the distinct possibility that similar situations that present the potential for constitutional rights violations will occur again in the future because the City has tacitly approved of this type of conduct.

145.    When CSPD failed and refused to discipline the officers for their clearly established constitutional violations, it approved of and ratified that conduct, which itself establishes a custom of CSPD. *See World Wide St. Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009). When an entity like CSPD approves a subordinate's conduct and the basis for it, liability for that conduct is chargeable against the entity because it has "retained the authority to measure the official's conduct for conformance with their policies." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion); *Groden v. City of Dallas*, 826 F.3d 280, 284 (5th Cir. 2016); *see also Balle v. Nueces Cty., Tex.*, 690 F. App'x 847, 852 (5th Cir. 2017). Under *Praprotnik*, "post hoc ratification by a final policymaker is sufficient to subject a city to liability because decisions by final policymakers are policy."

146.    The failure of CSPD to punish the officers or to make any reasonable attempt to implement meaningful changes in light of Mark's death emphasizes the point that this is how things have always been done and the CSPD approves of it. These officers, Defendant Raid Officers here, violated Mark's and Alyssa's constitutional rights in an egregious manner, which resulted in Mark being killed. This inexcusable use of deadly force resulted in no disciplinary action, no retraining, and no reevaluation of policies by CSPD. By doing nothing, CSPD ratified these officers' conduct.

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

147.    These constitutional violations by CSPD were the moving force behind the death of Mark and Alyssa's injuries. As a result of Defendant Raid Officers' violation of the constitutional standard set forth herein, Plaintiffs seek compensation from the Defendants as set forth more specifically in the section of this Complaint entitled "Damages."

## IX.    DAMAGES

148.    Plaintiff re-alleges all of the allegations in the previous paragraphs, as though fully set forth herein.

149.    **Actual damages.**  Defendants' acts and/or omissions were a proximate cause of the following Injuries suffered by Plaintiffs:

**a.    Estate of Mark Hopkins (Survival Claim; Tex. Civ. Prac. & Rem. Code § 71.021):**

   1.    Conscious pain and mental anguish suffered by Mark Hopkins prior to his death; and

   2.    Funeral and burial expenses.

**b.    Cynthia Hopkins (as wrongful death beneficiary of Mark Hopkins; Tex. Civ. Prac. & Rem. Code § 71.004):**

   1.    Mental anguish—the emotional pain, torment, and suffering experienced by Cynthia Hopkins because of the death of her son, Mark—that Cynthia Hopkins sustained in the past and that she will, in reasonable probability, sustain in the future;

   2.    Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that Cynthia Hopkins would have received from Mark had he lived—that Cynthia Hopkins sustained in the past and that she will, in reasonable probability, sustain in the future; and

   3.    Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that Cynthia Hopkins would have received from Mark had he lived—that Cynthia Hopkins sustained in the past and that she will, in reasonable probability will sustain in the future.

**c.     Geoffrey Hopkins (as wrongful death beneficiary of Mark Hopkins; Tex. Civ. Prac. & Rem. Code § 71.004):**

1.     Mental anguish—the emotional pain, torment, and suffering experienced by Geoffrey Hopkins because of the death of his son, Mark—that Geoffrey Hopkins sustained in the past and that he will, in reasonable probability, sustain in the future;

2.     Loss of companionship and society—the loss of the positive benefits flowing from the love, comfort, companionship, and society that Geoffrey Hopkins would have received from Mark had he lived—that Geoffrey Hopkins sustained in the past and that he will, in reasonable probability, sustain in the future; and

3.     Pecuniary loss—loss of the care, maintenance, support, services, advice, counsel, and reasonable contributions of a pecuniary value that Geoffrey Hopkins would have received from Mark had he lived—that Geoffrey Hopkins sustained in the past and that he will, in reasonable probability will sustain in the future.

**d.     Alyssa Michelle Wilson:**

1.     Physical injuries: Damages to Plaintiff's ears and for any injuries resulting from Defendant Raid Officers' unconstitutional search and seizure, excessive force, and invasion of privacy—that Alyssa sustained in the past and that she will, in reasonable probability, sustain in the future;

2.     Pain and suffering: Compensation for the emotional distress, mental anguish, and physical pain experienced from Defendant Raid Officers' unconstitutional search and seizure, excessive force, and invasion of privacy—that Alyssa sustained in the past and that she will, in reasonable probability, sustain in the future;

3.     Mental anguish—the emotional pain, torment, and suffering experienced by Alyssa because of the patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid she experienced; witnessing the death of her boyfriend, Mark; and the violation of her own constitutional rights and consequent injuries—that Alyssa sustained in the past and that she will, in reasonable probability, sustain in the future;

4.     Medical expenses: Any medical costs resulting from injuries sustained from Defendant Raid Officers' unconstitutional search and seizure, excessive force, and invasion of privacy—that Alyssa sustained in the past and that she will, in reasonable probability, sustain in the future;

5.    Lost wages: Any missed work due to injuries or time spent dealing with the consequences of Defendant Raid Officers' unconstitutional search and seizure, excessive force, and invasion of privacy—that Alyssa sustained in the past and that she will, in reasonable probability, sustain in the future;

6.    Property damage: Damages for any property that was damaged or destroyed during the patently incompetent, grossly excessive, and unreasonably unnecessary military-style raid, including her cell phone and computer(s).

150.    **Punitive/Exemplary Damages against Defendant Officer Norris** and **Defendant Officer Le**. Punitive/exemplary damages are recoverable under Section 1983 when the conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. Here, the conduct of Defendant Officer Norris (for the shooting death of Mark Hopkins) and Defendant Officer Le (for the detonation of a destructive device – an M84 flash-bang grenade) were done with evil motive or intent, or at the very least, were done recklessly or callously indifferent to the federally protected rights of Mark Hopkins and Alyssa Wilson. As such, Plaintiffs request punitive and exemplary damages to deter this type of conduct in the future.

151.    **Injunctive Relief.** Plaintiff seeks injunctive relief requiring the City of College Station to draft, implement, train, enforce, and supervise constitutional policies regarding the use of flash-bangs, specifically restricting their deployment to no-knock search warrants, including the use of flash-bangs in any application for a no-knock search warrant only, and to provide training, supervision, and ongoing monitoring and reporting to ensure compliance with these policies and to prevent future constitutional violations.

152.    **Prejudgment and post-judgment interest.**

153.    **Costs of Court.**

154.    **Reasonable and necessary attorney's fees and litigation costs**[2] incurred by Plaintiffs through trial, and reasonable and necessary attorney's fees that may be incurred by Plaintiffs for any post-trial proceedings, or appeal, interlocutory or otherwise, pursuant to 42 U.S.C. § 1988.

155.    **Nominal damages.**

156.    **Unliquidated damages.** Plaintiffs seek unliquidated damages in an amount that is within the jurisdictional

limits of the court.

## X.    CONDITIONS PRECEDENT

157.    Plaintiff re-alleges all of the allegations in the previous paragraphs, as though fully set forth herein.

158.    Plaintiffs reserve their right to plead and prove the damages to which they are entitled to at the time of trial.  All conditions to Plaintiffs' recovery have been performed or have occurred.

## XI.    TRIAL BY JURY

159.    Plaintiff re-alleges all of the allegations in the previous paragraphs, as though fully set forth herein.

160.    Plaintiffs have paid a jury fee and demand trial by jury.

---

[2] As part of litigation costs, various courts have awarded Plaintiffs prevailing in a §1983 case with attorney's fees (42 U.S.C. § 1988); expert witness fees, if deemed reasonable and necessary (*see e.g.,* 28 U.S.C. § 1920(6)); court costs and filing fees (*see Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598 (2001)); deposition and transcript costs (*see Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560 (2012)); travel costs (*see Chavez v. City of Albuquerque*, 630 F.3d 1300 (10th Cir. 2011)); and other necessary litigation costs such as postage, photocopying, and investigator fees (*see id.*)).

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

## XII.   <u>PRAYER</u>

161.    Plaintiff re-alleges all of the allegations in the previous paragraphs, as though fully set forth herein.

162.    For these reasons, Plaintiffs pray that Defendants be cited to appear and answer herein; that upon final trial hereof Plaintiffs have and recover judgment from Defendants; actual damages, exemplary damages, pre-judgment interest at the legal rate; interest on said judgment at the legal rate; costs of court; attorney's fees; injunctive relief; and for such other and further relief, both general and special, at law and in equity, to which Plaintiffs may show they are justly entitled.

Filed this <u>4</u>th day of <u>February</u>, <u>2025</u>.

Respectfully submitted:

**GILDE LAW FIRM, PLLC**

_____
Bradford J. Gilde | TSB#: 24045941 | FID#. 4010300
Bradley G. Ertl | TSB#: 24110896
Chelsea N. Gillespie | TSB#24144221
GILDE LAW FIRM, PLLC
*Mailing:*      5535 Memorial Drive, Suite F #154,
                Houston, TX 77007
*Phone:*       281-973-2772
*Facsimile:*    281-973-2771
*Email:*       bjg@gildelawfirm.com
                bertl@gildelawfirm.com
                cng@gildelawfirm.com

*—AND—*

**DURHAM, PITTARD & SPALDING, LLP**

*/s/ Thad D. Spalding*

_____
Thad D. Spalding | State Bar No. 00791708

Page 59 of 60

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND

Shelby J. White | State Bar No. 24084086
DURHAM, PITTARD & SPALDING, LLP
P.O. Box 224626
Dallas, Texas 75222
(214) 946-8000 – Office
(214) 946-8433 – Facsimile
tspalding@dpslawgroup.com
swhite@dpslawgroup.com

—*AND*—

**AARON PERRY LAW FIRM**

*/s/ Aaron William Perry*

_____

Aaron William Perry | State Bar No. 24068270
AARON PERRY LAW FIRM
4545 Bissonnet, Suite 202, Bellaire, TX, 77401
(713) 393-7788 Phone
(713) 586-0380 Fax
Aaron@aaronperrylawfirm.com

***ATTORNEYS FOR PLAINTIFFS CYNTHIA
HOPKINS and GEOFFREY HOPKINS,
individually and on behalf of the ESTATE OF
MARK HOPKINS, Deceased; and ALYSSA
MICHELLE WILSON***

PLAINTIFFS' ORIGINAL COMPLAINT and JURY DEMAND